Good morning. May it please the Court. I'm Louis Mastriani for the Appellant Fisher Tooling Company doing business with Astronomata. Your Honors, I think it's important to note at the outset some facts regarding the underlying case which generated the case that you have before you here. In that case, it was a patent infringement case filed by the Appellé Gilet in New Jersey against Astro Fisher Tooling Company and also several suits against its customers. Astro moved to transfer the case to California, which motion was granted, and also moved to have the customer suit stayed under the customer suit exception. And the New Jersey court stayed those cases pending the outcome of the California case. In the California case, where discovery did take place but was not completed, a Markman hearing was scheduled pursuant to Markman v. Westview, which was intended to interpret the scope of the claim. It was one claim, claim seven, of the Gilet 190 patent that was asserted. And that hearing took place after extensive briefing, and the trial court rejected Gilet's proffered claim construction almost in its entirety. On that basis, Gilet moved two and a half months later, maybe three months later, to dismiss the case with prejudice. And in its motion, it admitted and conceded that under the claim construction that was issued by the court, which we submit was the only claim construction that could reasonably be issued, it could not. In fact, it was impossible to prove infringement. And for that reason, a decision was made to not pursue an appeal to the Federal Circuit and to ask for dismissal with prejudice. The court, before the court ruled, Astro moved to be declared the prevailing party, and the court, in dismissing the case, declared Astro as the prevailing party. So this is a situation that is different from the recently decided case here before the court in the Film Tech case, where there was a situation where below the patentee was successful but was reversed on appeal. Based on the case below, the underlying case, and because of evidence that was adduced during the discovery that there were four fatal defects in the patent, three dealt with invalidity based upon a deliberate mistranslation, based upon a deliberate misjoint or inventor, and because of the mistranslation and the loss of the priority date from the European patent and the patentee being stuck with the fatal defect. There was an on-sale bar and a publication bar, which invalidated the patent. On top of that, we learned in the underlying case that the sole inventor, Fabrice Petit, used a gilet prior tool, a hose clamp plier, that below the jaws of the plier were identical to the patented invention. These are all validity issues, right? The last one is an unenforceability issue. It was fraud in the patent office because... What's the validity issue? Well, Your Honor, no, really it's considered to be unenforceability. It would be if you could use that tool to argue in conjunction with other references that there would be... In any event, you didn't prevail on those grounds. You didn't prevail on those grounds. In the underlying case? Yes. That was never at issue before the Court. We never got a chance to move to summary judgment. Is what I asked unclear? No, Your Honor. Okay. Did you hear my question? We did not prevail on that below, because it was not before the Court. You did not prevail on it? That's correct, Your Honor. Is it so hard to answer that question? No, it's not, Your Honor. Okay. So since you didn't prevail on that, how can you... I mean, most of your grounds for bringing a malicious prosecution claim are based on validity and enforceability, which are not issues over which you prevailed below. Can you bring a malicious prosecution claim arguing claims where you did not? Yes, Your Honor. Yes, Your Honor. And excuse me. I want to amend my statement about not prevailing below. We did prevail below because our complaint asserted as affirmative defenses that the patent was invalid and unenforceable, in addition to not being infringed. We would declare the prevailing party, period, with no nuances. It was just a declarative statement. We never had a chance to produce evidence, move for summary judgment, or have a trial. But on your honor's with respect analogy here, we did prevail. We were without question the prevailing party. I asked you a question. I don't remember any analogy or anything. I asked you a question. Can you prevail a malicious prosecution claim? Can you bring a malicious prosecution claim as to claims as to which you did not, in fact, prevail in the underlying suit? It's capable of a yes answer. It's capable of a no answer. It's capable of a I don't know answer. Under that broad rubric, yes, Your Honor. No, we would not be able to bring a malicious prosecution. But I submit to you that we did prevail. You prevailed on the invalidity issue? On the validity issue? We prevailed on our case. We prevailed on our position of being accused of infringement. The court never got beyond. In other words, this — I know the court never got beyond, of course. That's why I'm asking the question. The question is, since the court didn't get beyond infringement, it never got to validity, so you didn't win on validity. Can you base a malicious prosecution claim on a claim now that the patent was invalid? I don't know. It has an answer, yes or no. I mean, I don't know why. I'll say this, and I try to dance around it. I would say yes for this reason, because I think public policy would frown upon a situation where in an underlying case, if someone brought a clearly baseless — Let me just make it clear. I'm really not asking for your personal opinion. I'm really asking for citation to authority. Do you know of any authority that addresses that issue? Not your personal view or what you would like to have the law be. I cannot cite you a case right now that has the facts of this case where the patentee, knowing its patent was invalid and not infringed, unenforceable, pulled the case before the adjudication. That's what happened here. And that would be a gross injustice for the accused patent infringer to be denied the right to seek redress under malicious prosecution because the patentee pulled the case before it could be held to account. That, I think, is wrong. I'm sure there must be analogous precedent. I can't cite you precedent on point. But I submit to you that that would be a gross injustice. Okay. You've got two minutes left. Do you want to keep us at a bottle? Yes, I would. Thank you, Your Honor. Good morning, Your Honors. I'm Maryam Shoukri, and I represent Abheli Jilay-Utiyaj. As we indicated on our letter to the Court, I believe both I and Mr. Daniel Lula for Matthew Collins and Mr. Michael Coyne for Mayhew are willing to stand on our briefs unless you have some questions for each of us to answer. Why weren't you required to get a validity opinion before bringing this case, the underlying case? Why was Jilay not required to? Yes. Yes. You can't win a patent case unless there's a determination that the patent is valid and infringed. Infringed is not enough. You've got to have a patent that's valid and infringed. You got two, three maybe infringement opinions. One of them specifically said you better get a validity opinion, but that didn't happen. Now, as to validity, you're not protected by the advice of counsel, right? You are representing the client. You are not. So you're not, you don't claim that you're protected by the advice of counsel defense. Yes, Your Honor, I do believe that I am protected because we have alleged that Jilay-Utiyaj, which is a French company, relied on advice of counsel throughout, beginning with its counsel in France, which was Mr. to obtain the American patent, and then thereafter they went to Matthew Collins in order to proceed with their patent infringement lawsuit. Obviously, Jilay-Utiyaj is not in a position to be making judgment calls on validity of patents, whether it's appropriate to file patents. Didn't the client in fact request a validity opinion? I know, Your Honor, what e-mail you're probably referring to, but I would submit to you that the client you're referring to is Mr. David Loft, who is basically – I believe he wrote that e-mail. I don't know what evidence would support that in the record, but he wrote that e-mail using layman's terms. I don't think that he was necessarily talking about getting a validity opinion the way that we would consider that opinion under the law, that term under the law as a term of art. I don't think he was even, frankly, focused on that. He was just relying on himself. So your position basically is if you find lawyers willing to bring the case, you're off the hook for malicious prosecution, unless you fail to provide any information to the lawyers. No, Your Honor. My position is that if the client receives a patent that he assumes or she assumes is valid and has not been told or has no evidence to believe that the patent is valid, the client is going to go with that and say, all right, great. They gave me this patent. They gave me this document. It looks really good. This is my patent. And unless they're told otherwise by counsel, especially when they're referring to counsel, they will assume that their patent is valid. And then when they want to – now that they've paid all this money and now they have this valid patent, they hear that somebody is infringing their patent. They see that somebody is using – you know, they've put time and energy in developing this instrument, and when they see somebody else on the market using it – They're still required to provide the lawyer all of the relevant information. If they leave out relevant information, then they lose the protection of the advice of counsel, right? I would agree that they have to provide all the information that they have. And how does a client know of all the information in the world, what the client is supposed to provide and what the client is not supposed to provide? David Loft was the person who was basically communicating with counsel on behalf of Gilles Utillage, testified, and we have his declaration stating, that he gave all the information that he thought was valid, and then thereafter, he provided all the information that he was requested to provide. Beyond that, I don't think a client can do anything else, because the client really is not in a position to determine, really, what's material and what's not, other than making his or her initial determination and then relying on counsel to say, well, do you need anything else? Whatever else you need from me, I will provide it to you, which is exactly what happened in this case. Did they provide the information about the prior patent, the one that was modified to create this patent? It was a prior patent. It was a prior claim, right, that was modified by your client to create the current? Well, I believe that there was – I'm sorry, Your Honor, I'm not understanding. I understand the current invention, the invention that was subject of this patent. Right. Was a modification of a prior patent also held by the client? No, Your Honor. I don't believe that's the case at all. I don't believe that the evidence before the Court shows that at all. It wasn't a modification of a prior patent. What the evidence that they have submitted, or at least they have tried to, with all priors before, and to suggest that they have to show that they have invented a prior, a prior is, I mean, that's not anything new about having priors. I mean, the prior item that they're referring to was not anything that was novel or special in any way that had to be disclosed. And in any event, I think that the focus here is – You may not be a patent lawyer, but, you know, prior art can be really old stuff. No, no, I understand. It can be general stuff. I understand that. And that's the first thing. In fact, if it is novel, then it is itself might be patentable. You're right, Your Honor. I stand corrected on that. You're right about that. But again, what I think the evidence in the record shows that Mr. Guyoux, who's the French prior inventions, and that he had actually prosecuted patents on behalf of Julliard Tiage on the prior inventions, and he was the one who provided all of the information to both the patent office, the European patent office, and also to the counsel in the United States. Why don't we hear from Mr. Matthews. Thank you, Your Honor. Good morning. May it please the Court. Daniel Lula of Pain and Fears, LLP, appearing on behalf of Matthews Collins. I present myself for questions by the Court. Excuse me? I present myself for questions by the Court as my sister of spying. My question is, why isn't the Matthews firm required to get a validity opinion before bringing this lawsuit? Because, Your Honor, I believe that the Matthews firm was presented with a facially complete and duly issued opinion, patent, excuse me, and was relying on the statutory presumption of validity, which can only be overcome by clear and convincing evidence. Well, you just said the same thing twice. Every patent has a presumption of validity. And, in fact, if you didn't have a patent, you wouldn't be bringing a patent suit, right? So you've really said less than two things. You've said less than one thing. What you're saying is we had a patent. Well, that's the premise of my question. Having a patent, why isn't counsel required to determine before he gets to the market and starts bringing lawsuits and starts rattling sabers and driving competitors out of the market with letters and people going around and waiving complaints and doing all of those highly anti-competitive things, before doing all of those things, why isn't counsel required to come up with a validity determination? Particularly when you're dealing with a patent, as in this case, that derives its priority date from a foreign patent. So it has the additional levels of problems that have to do with translation. Your Honor, I apologize that it may come across that I'm saying less than one thing. But I think that my answer is because of the statutory presumption of validity, that that is entitled to be relied upon once the attorney has made, I would make a distinction, Your Honor, between sort of a facial validity analysis and a full validity analysis. In other words, I think every attorney is required. So your view is that there's no per se requirement, there's no approval requirement to get a validity. Okay. Fair enough. Let's accept that. What about the fact that here the infringement opinion that he got specifically said you need a validity letter? Well, Your Honor, the record will show that, I believe Your Honor is referring to the infringement opinion from Lachenbach Siegel, the outside law firm. But there were two different infringement opinions. One was sent to my clients, Gilles, and also, I believe, to Mayhew. And a different infringement opinion was sent to my client, Matthews Collins. The infringement opinion we received from Lachenbach Siegel, which is in the supplemental excerpts of record attached to my declaration, contained no such limitation. So while we might speculate on what the situation would have been had we ---- When did Matthews eventually get the other version? I believe not until discovery in this case. Certainly we requested and received from Lachenbach Siegel a separate infringement opinion. We received it. It is in the supplemental excerpts of record. It contains no such limitation or direction to perform a validity analysis. So, again, Your Honor, I would come back to the idea, which I think is quite reasonable and I found no authority to the contrary, that an attorney presented with a facially valid duly issued patent is allowed to rely on the presumption of validity until it receives information that might suggest otherwise. And in this case, the record shows that it virtually ---- the moment that my clients received the first hint of a breath of a problem with the validity of the patent, namely the supplemental interrogatory responses served during the underlying litigation which made reference to a material mistranslation, my clients sought out Gillet, sought out their clients and made a good faith inquiry as to the circumstances of the translation, convinced themselves that the translation had been handled by an outside independent translation firm in Paris, satisfied that Gillet hadn't had any involvement, let alone steered the translation. My clients, I think, fairly reasonably concluded that there was no issue. I thought there were more than one translation that the client had. We inquired as to the translation presented to the U.S. Patent Office. There may have been other translations that were performed in connection with European patents or for private use, but we inquired as to the genesis of the translation submitted to the U.S. Patent Office. Well, you say there may have been. In fact, there were. But again, I don't think that they were learned about until discovery in this case. And why is that? Why did the counsel have the responsibility to get those? Or why didn't the client have a responsibility to provide those? Because we were suing on the U.S. patent, Your Honor. All right. Why wouldn't the translations of a French patent, alternative translations of a French patent, be relevant? I mean, the U.S. patent builds on the priority date of the French patent, right? Correct. Okay. That means as far as an accurate translation, do you get the priority date? Correct. If there were other translations which were less favorable, why weren't those required to be provided? Well, I must admit I'm not certain whether they were provided earlier or in discovery in this case. But what I'm referring to is that the translation that was submitted to the U.S. Patent Office was the one that we inquired upon as to the certainty of the translation. No, I understand. I understand. But why didn't the client have a responsibility to provide those other translations? When you were investigating the validity of the U.S. patent, obviously the accuracy of translation would matter. If there are other translations that are less favorable that the client has and suppresses, that would be relevant. I think I heard a kernel within Your Honor's question that is the source of our problem. And that's that Matthews Collins did not prepare or undertake a full validity analysis of the 190 patent during the underlying litigation or, indeed, at any time, because it, A, was not asked to do so and, B, was not required to do so. We did investigate a specific translation and the circumstances of it once that came up in the underlying litigation. Let me ask you this. I don't understand the translation difficulty. The French phrase is mécanisme critique and is translated in English as either ratchet or pawl. That seems to be a perfectly accurate translation. I don't understand what the fight's about. We agree, Your Honor. Okay. Certainly, we – I mean, if something had been mistranslated, that's one thing. But that seems to me a perfectly accurate translation. Well, as is reflected in our brief, Your Honor, I feel that we have several trenches if we envision this as World War I warfare in which we can retreat to. The first is that it's not a mistranslation. The second is that it's not a material mistranslation. The third, it wasn't intentionally mistranslated. It wasn't material to the patent examiner's decision to issue the patent. And there's no evidence of any willfulness or steering or fraud on the part of my clients or Gillet or anyone else. Well, as I understand it, what they're saying is that the thing that refers to as the ratchet is really not a ratchet in the French patent. Well, that is. That it is. This is the diagram of page 34 of their brief. That is my adversary's argument. And this is of the brief in 56165. Do you have it there? And there, of course, would be a ratchet. There's one in 21, which is clearly not a ratchet. It's a latching mechanism. Well, Your Honor, the court below said that she certainly did not find the idea that that might perform the functions of a ratchet or act as a ratchet to be easily decided, but rather something to struggle with. There was expert testimony on that, Your Honor, in the case below. It's clearly not a ratchet. I mean, this is a locking mechanism. There's nothing I have to struggle with to figure that one out. Well, Your Honor, again, I would fall back on the other trenches that I mentioned as well. The 20 and 143 look to me like ratchet mechanisms. But from best I can tell here, but 1 and 21 certainly don't. Your Honor, again, that was hotly contested as to whether that machined piece could permit motion in one direction only. But again, as I said, I would fall back on the other grounds that I mentioned, the other trenches that I mentioned, which is if, indeed, there was an innocent mistranslation, there's no evidence that it was done to broaden claims or claim that are not patented. And in point of fact, as I said, that was hotly contested below as to whether that piece could, in fact, perform the functions of a ratchet. I will agree with the court it would be a one-tooth ratchet rather than a multi-tooth ratchet, but it could, indeed, perform the functions of allowing motion in only one direction. Another issue, Your Honor, is that this piece of equipment. You know, I don't know where you get that. I've handled dozens of flyers with things like that, and all they do is they catch. It's a catch. It allows the thing to open or keep it locked closed. Your Honor, these issues were not litigated to judgment or resolution below. Certainly, the validity issue was not litigated to a resolution. The issue of this mistranslation or supposed mistranslation was not litigated. I think it's notable that our adversaries here did not bring a counterclaim for a declaratory judgment that the patent was invalid. They didn't bring, you know, to this day, this remains a presumptively valid patent. We have a lot of swirling argument. We have a lot of swirling innuendo. But we would submit that the trial court's decision below is correct. Thank you. We have a couple of minutes for rebuttal. Thank you, Your Honor. Your Honor, the European patent called the mechanism de cliquet a pull mechanism. That was provided by Mr. Diu to the European Patent Office. The United Kingdom Patent Office was given a translation by Mr. Diu for a latch mechanism. He then gave the U.S. Patent Office, the attorneys, the associate attorneys here, a translation for ratchet mechanism, which is more than a latch or pull mechanism. And because of that, that was a problem. He gave it to them because he knew that the AstroTool had a ratchet, not a catch. And with regard to these statements by Mr. Diu and Mr. Loft and declarations, we had numerous objections to those which are of record. And I'll point out to you regarding this situation that Your Honor was talking about, about the prior art gelee plier. As pointed out on page 34 of our principal brief in the 56165 case, the catch or latch mechanism, which you're pointing out, is identical. And that was the only novelty point found in the PCT report that the U.S. Patent Office relied on. Had that prior art report, excuse me, prior art pliers been given to the European Patent Office as well as to the U.S. Patent Office, we would not be here today. There would be no patents whatsoever. As far as the opinions. They look very different to me. Pardon me? They look very different to me. On page 34. Yeah. They really look very different. I'm talking about the catch. Which numbers should we be looking at? You should be looking at 21, which is in the bottom. Yes, on 21 right here. And this right over here where I have circled up above. They're identical. And the reason why they're identical is because. Yeah, no, the catch is the same, but they're obviously not the same pliers. No, no, I agree with you. One is a ratchet plier. One is not. The reason, but the point is, is that the Patent Office found that the only reason to allow this as an invention in the PCT report was because the prior art did not contain this latch mechanism. That's the only point of novelty. And, of course, it existed. It had existed for years. I've seen this for years. Yes, Your Honor. I grew up with latches like that in Romania. And they're way behind. Well, and there's testimony in the record about pliers in Europe and so on. But let's talk about the Fellman opinion very quickly. The fact of the matter is that the opinion by Marvin Fellman of the firm Lockenbach Siegel that asked for and recommended a validity analysis was the one that was relied on by Matthews Collins in the summary judgment motion and by the court. And more importantly, Matthews Collins' own expert, Peter Gluck, he said, agreeing with Harry Manbeck, our expert, that you have to, for due diligence, in addition to many other things, evaluate validity, and when you have a foreign patent, you need to get the entire record to make sure that you're not claiming more in the U.S. process than you did in Europe, because you would have severe problems. And that's very important. And on this language point, the fact of the matter is that Gillet had given different translations to different patent offices and gave one to the U.S. Patent Office that was wrong. And both inventors testified that they did not. We have read the brief. Thank you. Thank you, Your Honor. Do you have your brief there? Yes. Mr. Messina. Yes. Look at page 16 of the 165 brief. Page 16? Yeah. Yes, Your Honor. First full paragraph. You see a case by the name of Myers v. Nagel? Yes. You see it's an unpublished decision dated 1992? Yes, Your Honor. Are you familiar with 9th Circuit's Rule 36-3C? Regarding citing unpublished decisions? Yes, Your Honor. And what does it say? It says unpublished, Your Honor. You may not cite them. Are you familiar with our rule that says you may not cite unpublished decisions? I am not, Your Honor. And I apologize for doing so. Okay. Take a look at page 40. Last line, Barrett v. Nagel. Page 40, Your Honor? Yep. I have it. That's another unpublished disposition. I'm sorry. Which case are you referring to? Barrett. 2005 9th Circuit. At the bottom. At the very bottom, last line. I don't have unpublished here. I'm sorry, Your Honor. I was not aware that it was unpublished. It's FedEx. FedAppendix means unpublished. And you will find the same citation in your other brief on page 38. Are you for the same case, Barrett? Same case. I will grant you leave to file revised briefs omitting the unpublished dispositions. We'll do that, Your Honor. Okay. You will not charge your clients for the preparation of those briefs? No, of course not. Okay. Thank you, Counsel. Thank you, Your Honor. Case is argued. We can submit it. All rise. This court in the session stands adjourned. Thank you.
judges: Kozinski, O'scannlain, Fletcher